SEAWAY BEVERAGES, INC., Petitioner,

v.

C. Douglas DILLON, Secretary of the Treasury of the United States, et al., Respondents.

No. 17045.

United States Court of Appeals District of Columbia. Circuit.

Argued March 5, 1963.

Decided April 11, 1963.

Petition for Rehearing Denied June 3, 1963.

Mr. Mandel L. Anixter, Chicago, Ill., with whom Messrs. Joseph B. Danzansky and Raymond R. Dickey, Washington, D. C., were on the brief, for petitioner.

Mr. Elliott H. Moyer, Atty., Dept. of Justice, for respondents.

Before WILBUR K. MILLER, FAHY and BURGER, Circuit Judges.

BURGER, Circuit Judge.

Acting under Section 4(a) (2) of the Federal Alcohol Administration Act,[1] the Secretary of the Treasury denied petioner's application for new basic permits as a wholesaler and importer of malt beverages. The action of the Secretary was taken under the above cited statute which in essence authorizes him to grant permits unless he finds that the person applying, or in case of a corporation, any of its officers, directors or principal stockholders, has been convicted of specified crimes or misdemeanors or by reason of trade connections is not likely to operate in conformity with federal law.

Petitioner, Seaway Beverages, Inc., whose president and sole stockholder is Dominic Volpe, makes two contentions here: (a) that the findings under this section of the statute concerning Volpe's prior "associations" are not supported by substantial evidence on the record as a whole, and (b) the Act cannot properly be interpreted so as to deny permits on the sole ground that Volpe, the principal shareholder and chief executive officer of petitioner, was associated in business with a person of ill repute where, as here, the conduct of corporate petitioner is unquestioned and the conduct and reputation of Volpe, apart from the "associations" with one Accardo, are good. Petitioner contends in essence that Volpe's limited business associations

1. 49 Stat. 977 et seq., as amended, 27 U.S.C. 204(a) (2).

with a known racketeer, Accardo, in circumstances where such association was compelled by his employment as Sales Manager and President of a beer distributing company, is not sufficient to outweigh Volpe's lifetime record of no arrests or convictions and the evidence of numerous character witnesses, including clergymen, lawyers, police officers and others. It is argued that failure to accept the undisputed testimony of character witnesses was arbitrary.

After an extended investigation on the application, petitioner was given a formal Notice of Contemplated Disapproval of Application For Permit which recited as grounds for disapproval:

"1. During the period 1953–1956, while sales manager of Premium Beer Sales, Inc., Dominic Volpe knowingly associated with and caused to be employed as a beer salesman one Jack Cerone, a person alleged to be of ill repute and a member of a group of hoodlums headed by Anthony J. Accardo.

"2. During the period 1956–1959, while President of Premium Beer Sales, Inc., Dominic Volpe knowingly associated with and assisted in the employment as a beer salesman of Anthony J. Accardo, alias Tony Accardo, alias Joe Batters, a person of ill repute and alleged leader of Chicago hoodlums."

The ultimate action of the Secretary predicated on the Hearing Examiner's Findings did not rely on the matter contained in paragraph 1. The Director's Memorandum Opinion stated:

"After considering the complete record in this case, it is my opinion that the primary issue before me is whether the evidence of record as to Mr. Volpe's 'business experience' and 'trade connections,' exemplified by his association with Anthony J. Accardo, his role in the alleged employment of Anthony J. Accardo by Premium Beer Sales, Inc., and his

relationship to alleged 'salesman' Anthony J. Accardo after that alleged employment, adequately support the finding that the applicant is not likely to maintain operations in conformity with Federal law and whether the explanations in the record, particularly that of Mr. Volpe, of such association, role and relationship and the testimony as to Mr. Volpe's good reputation, establish that the applicant will be likely to maintain its operations in conformity with Federal law."

As to paragraph 2 it was stated:

"The very terms of the employment contract [signed by Accardo and by Volpe for Premium], and the facts and circumstances surrounding his employment, smack of racketeer operation [of Premium] and indicate that Accardo was employed because of his reputed underworld connections and his ability to influence, if not actually coerce, purchases by retail outlets."

The order under review rested on findings that Volpe as President and Sales Manager of Premium Beer Sales, Inc., of Chicago, participated in or acquiesced in the introduction of racketeering influences in the beverage industry by the employment of Anthony J. Accardo as a "beer salesman" at $60,000 annually plus substantial commissions at a time when Accardo's admitted general reputation in Chicago was that of a notorious racketeer and gangster. The record as to Accardo's bad reputation is not challenged. The record also shows contacts of Volpe with Accardo while Volpe was Sales Manager of Premium in preliminary meetings where Accardo's contemplated employment to promote beer sales and the amount of his salary were discussed; it shows numerous contacts with Accardo after he was employed by Premium. While Accardo is not shown to have actually performed any of his duties in the offices of .Premium, it appears that there was a marked increase in beer sales after he was employed. It was sub-

sequent to these preliminary negotiations that Volpe, by then President of Premium, signed a written contract with Accardo on the very unusual terms referred to. It is admitted that $12,000 to $15,000 per year was more or less standard as earnings of beer salesmen. Volpe's explanation of his signing the Accardo contract was that he always did whatever he was told to do by Henry Morgen, Board Chairman and former President of Premium.

Undisputed evidence shows that Accardo's connection was exploited in other ways than the direct promotion of beer sales. Testimony showed that officers of Fox Head Brewing Co., whose beer Premium distributed, urged a prospective investor to buy stock of Fox Head not only because it was a "better beer" but because Fox Head, as its President stated, "was going to have—and I sometimes hesitate to say this—Tony Accardo help him sell it with some of his friends."

Petitioner's challenge to the factual basis for the finding of Volpe's associations with Accardo falls upon an examination of the record and carefully documented findings.[2] We are satisfied that the Director and the Secretary did not ignore testimony favorable to Volpe as to his general reputation. But we cannot say that generalizations concerning Volpe's general reputation in the community were adequate to outweigh concrete evidence that Volpe had close associations with Accardo in business and socially. Volpe continued to be Sales Manager of Premium after he was made President and the only claimed functions of Accardo had to do with sales. Volpe makes no claim that he did not know Accardo's reputation as a gangster and racketeer in the Chicago underworld, and on the basis of the record it would have been idle for him to do so.

Petitioner's contention that he was not a "free agent" in the steps leading to Accardo's employment and the execution of the unique employment contract was found "not believable." We perceive no basis for disturbing these findings and conclusions. The Director of Alcohol and Tobacco Tax Division of Internal Revenue Service in reviewing the Examiner's findings concluded that, even assuming the alleged dominance of Volpe by Morgen, Board Chairman of Premium,[3] as Volpe contended, this constituted an admission by petitioner that Volpe was a willing "tool" or "front" for known racketeers and hoodlums whom he would

2. "15. Prior to the hiring of Accardo on or about May 1, 1956, Volpe, Cerone, and Feicht visited the home of Accardo in River Forest, Illinois, where possible employment of Accardo by Fox Head was discussed.

\* \* \* \* \*

"17. A week or two after the meeting referred to in Finding 16, Volpe met Arthur Feicht and John Churchman, both directors of the Fox Head Brewery, at Cerone's home and they proceeded with Cerone from there to a meeting with Anthony Accardo, Murrey Humphreys, and Eugene Bernstein to the Armory Lounge, Forest Park, Illinois, where prospective emploment of Accardo was discussed.

"18. Volpe and Feicht attended an Italian Festival in Franklin Park or Melrose Park, Illinois, where they met Accardo.

\* \* \* \* \*

"21. Volpe attended a 4th of July party at the home of Accardo in 1956.

\* \* \* \* \*

"23. Volpe went to Accardo's home on several occasions to give him messages and point [sic.] of sales material.

"24. Anthony Accardo and Jack Cerone attended a christening of a child of Volpes' in 1957.

\* \* \* \* \*

"27. Between April 1956 and August 1959, Volpe went on a five or six-day fishing trip to the Island of Bimini in the Bahamas with Anthony Accardo and Jack Cerone."

3. Interestingly, although no reliance is or need be placed on it, Morgen, in this period when asked to explain Accardo's large salary from Premium in a case in the United States District Court in Chicago, is reported to have testified that he did not know who worked for Premium and that Volpe "runs the show" and that he, Morgen, had sold his interest to Volpe.

be unlikely to resist in future operations under the license sought.

 Certainly it is clear that the objective of Congress [4] was to keep racketeer and hoodlum influence out of that phase of the beer business which lies within the regulatory power of Congress. It is equally clear that there is abundant evidence to support findings that Volpe had associated intimately with and acted as a business "front" for such noxious influences in the past and as recently as 1959 and under the statute such a finding warranted denial of the permits sought.

The order denying petitioner's application for basic permits is therefore

Affirmed.

See also 214 F.Supp. 848.

4. H.R.Rep. No. 1542, 74th Cong., 1st Sess. 3–8; S.Rep. No. 1215, 74th Cong., 1st Sess. 1–3.